IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FREDERICK J. BRENNAN, | * | |
| *Plaintiff*, | * | |
| v. | * | Case No. 1:18-cv-02119-ELH |
| DELUXE CORPORATION, | * | |
| *Defendant.* | * | |

**PLAINTIFF'S REPLY TO DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' CROSS FILED MOTION FOR SUMMARY JUDGMENT**

**I.   Introduction.**

Defendant filed a Motion for Summary Judgment, the Plaintiff filed a Response with a Cross-Motion for Partial Summary Judgment on Liability. Defendant filed a Reply, and this is Plaintiff's Reply in accordance with the Court's Local Rule 105(c).

In its Reply brief, Defendant states that the depositions of Julie Loosbrook and Kim Pettengill provided the Plaintiff with the information about the Consent Decree in a deposition taken by Defendant of its own witness for purposes of discovery and trial.

Defendant is correct that the depositions of Julie Loosbrook and Kim Pettingill, taken by Defendant's counsel were noted as discovery depositions.

However, Defendant did not posit the Consent Decree as a defense until August 21, 2020, almost two years after the lawsuit was filed. Further, Defendant has never changed the Answer to Interrogatory No. 2, which failed to inform the Plaintiff that the Consent Decree was the basis for the administration of the multiple choice test.

1

Defendant's last minute change of the reasons why the multiple choice test was administered, was an afterthought to shore up Defendant's defense to Plaintiff's claim.

In *EEOC v. Sears Roebuck Co.,* 243 F.3d 846, 853 (4th Cir. 2001), the Fourth Circuit observed that "a fact finder could infer from the late appearance of [the employer's] current justification that it is a post-hoc rationale, not a legitimate explanation" for its [employment decision]." See also, *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted... by an employer who `fully' articulates its reasons for the first time months after the decision was made.").

**II. Defendant's Contention That it Would Have Been an Undue Hardship to Offer Plaintiff Training, Which Would Not Have Required Him to Agree with Defendant' Position, is Absurd.**

Defendant contends that to offer Plaintiff a video or live presentation on transgender issues to fulfill the requirements of the Consent Order would be an undue burden because it "would have created a greater than '*de minimis*' cost to Deluxe, both economic and non-economic, and would have constituted an undue hardship." Def. Memo. at 8.

Julie Loosbrock, Defendant's Chief Human Resources Officer at the time, testifies that it would be charged $ 32,000.00 by Corpedia Corporation, to create a custom course for Mr. Brennan.

Defendant's contention is absurd. The Consent Decree did not require Deluxe to spend $ 32,000.00 on one employee. It merely required that it provide training to its employees on transgender issues.

The Consent Decree gives the Defendant the responsibility for fashioning a training program. The Consent Decree does not mandate that the employee confirm his belief in the transgender policy. It merely states that the employee be trained in the policy. Training is not defined. It is left to Deluxe's discretion.

The information to be imparted to Mr. Brennan about the transgender issues was not

2

complex.

Deluxe is a large corporation. According to its website (www.deluxe.com) it has 4.8 million active small business customers and more than 4,600 financial institution clients. It has hosted more than 1 million websites for individuals and businesses, and has a North American network of approximately 300 distributor-franchisees serving local businesses.

It is safe to assume that Deluxe has a large Human Resources ("HR") Department.

The information on transgender employee could easily be set out on one sheet of paper. Why not just provide the Plaintiff a fact sheet on Deluxe policy relating to transgender employees, which a Deluxe HR official would present to Mr. Brennan and ask him to read it, and be available for any questions? Or, ask Mr. Brennan to attend a live presentation by one of Defendant's HR employees to explain Deluxe's policy on transgender employees. How long could that take? Thirty minutes, an hour?

There are many other ways that Defendant could have fulfilled its obligations under the Decree and avoid the expenditure of large sums for a custom video.

This would have fulfilled Deluxe's responsibilities under the Consent Decree.

This would have avoided the $ 32,000.00 cost claimed by the Defendant, since Deluxe was already required to pay its HR employees the normal salary.

The burden of establishing undue hardship is on the Defendant. *EEOC v. Consol. Energy, Inc.* 860 F. 3d. 131, 142 (4th Cir. 2017.

> "To establish undue hardship, the employer must demonstrate that the accommodation would require the employer "to bear more than a *de minimis* cost." However, "'[u]ndue hardship is something greater than hardship.'"[249] Factors to be considered include "the identifiable cost in relation to the size and operating costs of the employer, and the number of individuals who will in fact need a particular accommodation." Generally, the payment of administrative costs necessary for an accommodation, such as costs associated with rearranging schedules and recording substitutions for payroll purposes, or infrequent or temporary payment of premium wages (e.g., overtime rates) while a more permanent accommodation is sought, will not constitute more than a *de minimis*

>cost, whereas the regular payment of premium wages or the hiring of additional employees to provide an accommodation will generally require more than *de minimis* cost to the employer."

US EEOC Compliance Manual, Section 12: Religious Discrimination, 12-1.B.2. See, Commission Guidelines, 29 C.F.R. § 1605.2(e)(1). See also, Tabura v. Kellogg USA, 880 F.3d 544, 558 (10th Cir. 2018) (reversing summary judgment for employer where it "did not . . . cite to any evidence to support its assertions" that accommodating plaintiffs' need to observe their Sabbath would impose an undue hardship "in the form of unauthorized overtime, quality control issues, and even forcing entire lines to shut down"). See also, *Brown v. Gen. Motors Corp.*, 601 F.2d 956, 960 (8th Cir. 1979) (holding that "projected 'theoretical' future effects cannot outweigh the undisputed fact that no monetary costs and *de minimis* efficiency problems were actually incurred during the three month period in which [employee] was accommodated"); *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (undue hardship requires "proof of actual imposition on coworkers or disruption of the work routine" rather than "conceivable or hypothetical hardships" (internal quotation marks and citation omitted)); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir. 1989) ("Any proffered hardship . . . must be actual," not speculative); *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 133-34 (3d Cir. 1986) (finding that employee's request not to be scheduled for Saturday work due to Sabbath observance did not pose undue hardship where district court found that efficiency, production, and quality would be not affected and entire assembly line remained intact notwithstanding employee's Saturday absences).

Defendant cites the case of *Baltgalvis v. Newport News Shipbuilding* Inc., 132 F.Supp.2d 414 (E.D. Va. 2001), and states that "both a $ 50.00 IRS penalty for non-compliance with the Internal Revenue Code and"the cost burden of applying for a waiver of the IRC's statutory penalty provision" were more than *de minimis* and therefore constituted and undue hardship as a matter of law. Def. Memo. at 8-9.

Defendant deftly omits certain portions of the Court's opinion. What the Court said was that "an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law." *Baltgalvis*, 132 F.Supp.2d at 419. This the Court was not prepared to allow.

However, in this case, Plaintiff did not want the Defendant to violate any law, or even the Consent Decree. In fact he knew nothing about the Consent Decree. Ex. 1, ¶ 15.

The whole episode with Mr. Brennan shows that Deluxe was not really interested in working with Mr. Brennan. It wanted it its own way and nothing else. And, when Mr. Brennan would not bend to Deluxe's will, after the salary reduction, it fabricated a performance issue in order to remove him, rather than accommodating his religious views.

In summary, given the size of the Defendant, the alternatives available to Deluxe to fulfill its Consent Decree obligations, the reasonable cost to provide Mr. Brennan "training" on Deluxe's policy on transgender issues was not more than a *de minimus* cost.

### III. Plaintiff Has Set Forth a *Prima Facie* Case of Religious Discrimination for Failure to Accommodate.

In Section IV of its brief, Defendant contends that "Mr. Brennan has not established *a prima facie* case because the record demonstrates that Mr. Brennan does not have a sincerely held religious belief that conflicts with an employment requirement." Def. Memo. at 11. Defendant contends that Mr. Brennan is "simply mistaken about the conflict." *Id.*

The basis of this contention seems to be that Deluxe was only "requiring employees to acknowledge their understanding of Deluxe's policy position on various issues, as required by the Consent Decree. *Id.* at 12. They were not asking Mr. Brennan to change his religious views on transgender individuals.

Defendant is asking the court to take a very narrow view of Plaintiff's statements. The transgender questions could not be divorced from the multiple choice test requirement, which Defendant admits was a Deluxe policy.

The transgender questions were part and parcel of the multiple choice test which Deluxe required employees to complete. The fact that Deluxe was not asking the Plaintiff to change his views is not the issue.

Mr. Brennan could not choose the answers sought by Defendant, so that created a conflict between the Plaintiff's religious beliefs and Deluxe's requirement to complete the multiple choice test. To Plaintiff's way of thinking, forcing him to answer the questions the way Deluxe wanted him to would be forcing him to deny his religious beliefs about transgender individuals, and this he could not do. Response Ex. 1, ¶ 12.[1] Plaintiff's religious views were clearly spelled out to Defendant in his June 16, 2017 email to Petra Ott. Response Ex. 9, p. 3.

Since the Plaintiff would not agree to choosing the expected answers, which addressed transgender issues, his refusal satisfied the conflict requirement of the *prima facie* case.

### IV. Plaintiff's Religious Conflict with Deluxe's Policy Was Protected by the Freedom Restoration Act of 1993 (RFRA).

The RFRA prohibits the "Government [from] substantially burden[ing] a person's exercise of religion, unless the Government "demonstrates that application of the burden to the person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a). In 2006, the Supreme Court

---

[1] For consistency with Plaintiff's earlier filing, this document will continue to refer to the exhibits appended to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment on the Issue of Damages that has been previously filed in this case. Any exhibits introduced in this Reply which have not been previously offered, will marked beginning with the number 12.

limited the RFRA to actions by the federal government. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006).[2]

The RFRA was designed to provide very broad protection for religious liberty. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. at 2767. Under RFRA, a Government action that imposes a substantial burden on religious exercise must serve a compelling government interest. *Id.* at . 2759. The Court's Consent Decree issued by is government action. See, e.g., *Keith B. Campbell - El v. District of Columbia, et al.,* 874 F. Supp. 403 (U.S.D.C. 1994); Northridge Church v. Charter Township of Plymouth, 647 F.3d 606 (6th Cir. 2011).

In his dissent in *Bostock v. Clayton County*, Justice Alito explained that RFRA "operates as a kind of super statute" and it "might supersede Title VII's commands in appropriate cases. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1754 (2020):

> "That statute [RFRA] prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest. § 2000bb-1. Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases. See § 2000bb-3.

At issue here is Defendant's Consent Decree entered into by the U.S. District Court for the District of Minnesota, with Defendant's consent to settle a discrimination case.

The question is whether the Consent Decree, as sought to be applied by the Defendant, burdens unfairly, the Plaintiff's religious liberty.

---

[2] In enacting the RFRA, Congress codified a constitutional rule, the compelling-interest "balancing test," that the Supreme Court had used until 1990 to determine whether generally applicable and religiously neutral laws that incidentally place a substantial burden on a person's religious practices are inconsistent with the free-exercise clause of the First Amendment to the U.S. Constitution ("Congress shall make no law…prohibiting the free exercise [of religion]"). According to the balancing test, such laws are unconstitutional unless they serve a compelling governmental interest.

Courts addressing the overlap between EEOC laws and rights under RFRA and the Free Exercise Clause have stressed the importance of a nuanced balancing of potential burdens on religious expression, the governmental interests at issue, and how narrowly tailored the challenged government requirements are.  US EEOC Compliance Manual, Section 12: Religious Discrimination, 12-1.C.3.

Clearly, Deluxe's requirement that Plaintiff complete the transgender questions on the multiple choice imposed a substantial burden on Plaintiff's religious liberty. Defendant's imposition of a salary reduction, followed by termination, was a violation of Plaintiff's religious liberty.

**V.    Plaintiff's Termination Is Properly Part of Defendant's Failure to Accommodate Claim.**

Defendant contends that Plaintiff has not demonstrated "a factual nexus between his refusal to complete the multiple choice test and his termination.

Defendant states that there is "no evidence that Mr. Brennan was terminated for the **policy violation** of failing to complete the training." Def. Memo.  15

What is important to note from Defendant's contention is that it admits that the multiple choice test was Defendant's "policy."

Contrary to Defendant's contention, a termination can also support a failure to accommodate claim.

This is most easily seen when a qualified disabled employee requests an accommodation for a disability but, instead of offering an accommodation, the employer terminates the employee.

Plaintiff has already demonstrated that a claim for termination can also be asserted in a failure to accommodate claim. *U.S. Equal Emp't Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017):

8

> Under our precedent, it explained, an employee is **constructively discharged-satisfying the third element of a failure to accommodate claim**-when "an employer deliberately makes the working conditions of the employee intolerable." (Citations omitted) (Emphasis added).

*U.S. Equal Emp't Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d at 144.  Se also, *O'Reilly v. Bd. of Child Care of United Methodist Church, Inc.*, Civil No. JKB-20-0570, (D. Md. October 6, 2020) (termination in the context of a failure to accommodate disability).

Plaintiff's termination should be included in this failure to accommodate claim for three reasons:

1. The email statement of Kim Pettengill on January 8, 2018 that if the Plaintiff did not complete the multiple choice test, after being penalized by a 1% reduction in salary, he could be terminated.

2. Plaintiff's satisfactory Performance Review going back to 2012.

3. Plaintiff's March 29, 2028 Formal Warning was fabricated by Mark Vain, Plaintiff's Supervisor, at the request of Deluxe's Human Resources Department.

4. It is supported by case law.

Defendant asserts that the first three sentences of the email between Kim Pettengill, Senior Employee Relations Manager, dated January 8, 2018, to Wendi Arntson, Deluxe Human Resources Manager, omitted by the Plaintiff in his brief, refutes Plaintiff contention that he was terminated on account of failing to complete the multiple choice test.  The complete email is restated here:

> "I reviewed the situation with Julie today regarding Fred in the previous situations we have had with him. After careful consideration, Julie **does not support termination at this time** she feels that ultimately we would be terminating her intention rather than actual action. We will apply the 1% salary reduction (which he has said he will fight) for not completing the training and **restated** again that **the expectation is that he will follow our policies**. **If his actions at any time do not align with our policies**, he could be subject to further action up to and including termination."

(Emphasis added).  Response Ex. 8.

A simple reading of the email shows that Deluxe was imposing the 1% reduction in salary with

9

"the expectation that [Mr. Brennan] will follow our policies."

As noted above, Defendant considered the multiple choice training test as one of its policies.

The email then went on to say that if Mr. Brennan's "actions at any time do not align with our policies, he could be subject to further action up to and including termination."

Defendant does not point to any other Deluxe policies which may have been at issue with Mr. Brennan at this time.

Therefore, the logical conclusion, is it was Deluxe's expectation that once the 1% salary reduction was in place, Mr. Brennan would agree to complete the multiple choice test.

The email clearly stated that if Mr. Brennan's actions did not align with [Deluxe] policies, he could be subject to further action up to, and including termination."

Seeing that the Plaintiff did not complete the multiple choice test after the imposition of the salary reduction, Defendant proceeded to terminate him, as set out in the email.

The email, viewed in the context and light most favorable to the Plaintiff, demonstrates, at a minimum, a genuine dispute of material fact, which would preclude summary judgment.

This conclusion is buttressed by the fact that Defendant's termination on account of performance was a sham.

Plaintiff received satisfactory Performance Evaluations while at Payce and Deluxe. Copies of Performance Evaluations from July 2012 through August 10, 2017. They are attached as Exhibit 2 to Plaintiff's Affidavit. The August 10, 2017 Performance Review, attached herein as Response Ex. 12, for the reader's convenience is notable for the following passage:

> "Fred has proven effective at managing his work time to meet the development deadlines for each software performance cycle during the period."

The following comment by Mark Vain is also notable:

> "**Manager Overall Comments:** Fred has been effective overall in his past year at Payce. Over

10

the coming year I would like Fred to take on assignments of increased scope."

On March 29, 2018 Mark Vain, Plaintiff's Supervisor and Ms. Wendi Arntson, Deluxe's Senior Human Resources Manager gave the Plaintiff a Formal Warning on a document entitled "Documenting Discipline." Reply Ex.13. [3] According to Mr.Vain, HR asked him to prepare this Formal Warning. Reply Ex. 14 Deposition of Mark Vain, Ex. 56:1-14.

The Plaintiff vigorously disputes the March 29, 2018 discipline. As explained in Section II.E, the issues were not performance related but manufactured by Mark Vain to appear so.

This document placed the Plaintiff on a "Plan for Improvement." The relevant language is as follows:

> "Fred needs to show substantial and sustained improvement when attempting to investigate and complete assigned tasks. " (These improvements were almost exactly the same as what was required on your last warning.[4]) Investigation of defects related to assign tasks, includes (but is not limited to):
> - Obtaining a thorough understanding of the reported defect number
> - Attempting to reproduce the issue number
> - Investigation of a available error logs
> - Investigation of coal-based logic directly related to the reported defect
> - Investigation using Webb searches
> - Providing a resolution to the research issue
>
> The Formal Warning document made this usupported statement:
>
> "Fred has been coached and directed many times by his manager and his peers since that initial warning."
>
> However, when asked whether he has any written record of those coachings, by him or or his

---

[3] This is the same document appended to Plaintiff's Response, as Ex. 6. It is reproduced herein because this copy is an Exhibit 11 to Mark Vain's deposition, which is discussed herein.

[4] This references a 2016 Warning, which the Client disputed at that time. However, whatever Plaintiff's shortcomings were at that time, the problem was corrected because Plaintiff's Performance Review, issued by Mark Vain on August 10, 2016 showed that Plaintiff's performance was "Successful", with no mention of any deficiencies.

11

peers, Mr. Vain testified that "he did not recall." Ex. 14, 66:21-67:67:8. Mr. Vain did not know if there was a list of those coachings. *Id.*, 67:9-11.

But, 22 days later, without waiting for any concrete improvement by the Plaintiff, Defendant terminated the Plaintiff on April 20, 2018 on the basis of his performance. Defendant has not produced any documents which show that Mr. Brennan's work has met the above criteria.

The failure to allow the Plaintiff to improve his alleged lack of performance clearly demonstrates that performance was not the reason for the termination.

When viewed in the light most favorable to the Plaintiff, terminating the Plaintiff without allowing him to improve his alleged deficient performance demonstrates that the termination was instigated by Deluxe's Human Resources Department because Mr. Brennan did not change his mind and complete the multiple choice test, a failure to "align with [Deluxe's] policy.

Defendant next contends that there is an absence of temporal proximity between Mr. Brennan's refusal to complete the Training and his written warning and termination. Def. Memo. at 16.

The problem with Defendant's contention is that the consequences for failing to complete the multiple choice test were delivered to Mr. Brennan in January of 2018, when Deluxe imposed the salary reduction.

The termination was administered on April 20, 2018, only three months after Deluxe sought to correct Mr. Brennan's failure to complete the multiple choice test by a salary reduction. Mr. Brennan was terminated even though there was no evaluation of whether he fulfilled the terms of any Plan for Improvement imposed upon him 22 days before.

There is, therefore, neither a factual nor a temporal issue with Plaintiff's contention that the termination supports his claim that, rather than accommodate his refusal, Deluxe decided to

terminate him.

As the foregoing demonstrates, there is a factual dispute on whether the March 29, 2018 Formal Warning and the termination was instituted because Plaintiff continued to refuse to complete the multiple choice test.

## VI. Summary.

The whole episode with Mr. Brennan shows that Deluxe was not really interested in working with Mr. Brennan. Deluxe wanted it its own way and nothing else. And, when Mr. Brennan would not bend to Deluxe's will, after the salary reduction, it fabricated a performance issue in order to remove him, rather than accommodating his religious views.

As previously requested, Plaintiff requests that Defendant's Motion for Summary Judgment be denied, and that Plaintiff's Partial Motion for Summary Judgment on the issue of liability be granted, and that this matter be sent for trial on the issue of damages, including the termination, and for such other and further relief, as may be appropriate.

/s/ John B. Stolarz
John B. Stolarz
U.S.D.C. No.: 01929
The Stolarz Law Firm
6509 York Road
Baltimore, MD 21212
(410) 532-7200
(410) 372-0529 (fax)
stolarz@verizon.net

Attorney for Plaintiff

W:\5281\MSJ- Plaintiff's Final Reply\Reply Brief.wpd

## CERTIFICATE OF SERVICE

      I hereby certify that on this February 4, 2021 a copy of the foregoing document was served through the Court's electronic filing system on:

John B. Flood, Esquire  
Flood Law LLC  
1 Research Court  
Suite 450  
Rockville, MD 20850  

Attorney for Defendant

                                               /s/ John B. Stolarz  
                                               John B. Stolarz

                                               Attorney for Plaintiff