IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FREDERICK J. BRENNAN,
    *Plaintiff*,

    v.

DELUXE CORPORATION*,*
    *Defendant*.

Civil Action No. ELH-18-2119

**MEMORANDUM OPINION**

In this employment discrimination case, plaintiff Frederick J. Brennan sued his former

employer, defendant Deluxe Corporation ("Deluxe"), alleging that he was disciplined and then

terminated from his job because of discrimination based on religion.  ECF 1-4 (the "Complaint").[1]

The case is brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), codified, as

amended, at 42 U.S.C. § 2000e *et seq.*

The Complaint contains three counts: "Discrimination on the Basis of Plaintiff's Christian

Religion" (Count One); "Failure to Accommodate Plaintiff's Christian Religious Belief" (Count

Two); and "Failure to Engage in Interactive Process to Arrive at an Accommodation" (Count

Three).  *Id.*  Brennan seeks reinstatement and monetary damages, including back pay and front

pay, and recovery for "emotional distress, humiliation, embarrassment, [and] loss of enjoyment of

life."  *Id.* ¶ 16.  He also seeks attorney's fees and costs.  *Id.*

Deluxe previously moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).

ECF 9. By Memorandum Opinion (ECF 16) and Order (ECF 17) of January 18, 2019, I granted

---

[1] Plaintiff filed suit in the Circuit Court for Baltimore County, Case No. 03-C-18-5335.  *Id.*
Deluxe timely removed the action to this Court on the basis of federal question jurisdiction (28
U.S.C. § 1331) and diversity jurisdiction (28 U.S.C. § 1332).  ECF 1 (the "Notice of Removal").

the motion to dismiss as to Counts One and Three of the Complaint. But, I denied the motion to dismiss as to Count Two.  Thereafter, the parties engaged in discovery. *See* ECF 28 (Scheduling Order).

Cross motions for summary judgment are now pending as to Count Two, pursuant to Fed. R. Civ. P. 56.  Deluxe's motion (ECF 77; ECF 78) is supported by a memorandum (ECF 78-2) (collectively, the "Deluxe Motion") and 20 exhibits. ECF 78-3 to ECF 78-23.  Plaintiff has filed a combined cross-motion for partial summary judgment and opposition to the Deluxe Motion (ECF 80, "Brennan Motion") along with 12 exhibits. ECF 80-1 to ECF 80-12. In particular, plaintiff requests judgment "as a matter of law, on the issue of liability" but requests a trial as to the issue of damages.  Deluxe has filed a combined opposition to Brennan's Motion and a reply in support of the Deluxe Motion (ECF 85), with ten additional exhibits. ECF 85-1 to ECF 85-10. Plaintiff has replied (ECF 88) and submitted three additional exhibits.  ECF 88-1 to ECF 88-3.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny both motions. In particular, Brennan has established a prima facie case for failure to accommodate based on the imposition of a one percent salary reduction, but there is a dispute of material fact as to whether Deluxe would have been subject to undue hardship in order to accommodate Brennan's religious beliefs.  And, there is also a genuine dispute of material fact as to whether Brennan was terminated because of his religious beliefs.

## I.    Factual Summary

### A.  Background

Brennan was hired by Paytime as a Software Engineer in 2004.  ECF 80-1 (Brennan Aff.), ¶ 1.[2]  Paytime became Payce, Inc. ("Payce").  *Id.*  Deluxe, a Minnesota corporation that provides financial and payroll technology services to client companies, acquired Payce in September 2016. ECF 1-4, ¶¶ 2, 3; ECF 78-2 at 3.

Plaintiff was employed by Deluxe in Towson, Maryland from the time of its acquisition of Payce until his termination on April 20, 2018. ECF 80-1, ¶ 1; ECF 78-5 (Brennan Deposition) at 3, Tr. 23:10-24:5.  From at least August 2016 through the date of his termination in April 2018, Brennan was supervised by Mark Vain, Chief Information Officer of Payce and then Deluxe.  ECF 78-5 at 8, Tr. 114:12-116:19.

Plaintiff avers that he is a "born-again Christian" (ECF 78-13 at 3) and has been a devout Christian since he was 25 years old—for about 27 years. ECF 80-1, ¶ 3. Since plaintiff became a Christian, he has attended "regular church services almost every Sunday." *Id.* ¶ 4.  According to Brennan, he "always received satisfactory Performance Evaluations while at Payce and Deluxe." ECF 80-1, ¶ 2; *see* ECF 80-2 (Performance Evaluations from July 2013 to August 10, 2017).

### B.  The Consent Decree

The Equal Employment Opportunity Commission ("EEOC") and Brittney Austin, a former Deluxe employee and a transgender woman, filed suit against Deluxe Financial Services, Inc. in

---

[2] In its opposition, defendant asserts that the Court should not consider plaintiff's Affidavit (ECF 80-1) because "the oath utilized by Plaintiff above his signature does not comply with the requirements for submitting an unsworn declaration under 28 U.S.C. § 1746." ECF 85 at 12 n.6. However, § 1746 merely states that a declaration must "substantially" be in the form provided in the statute. Thus, although the plaintiff's oath does not use the precise language used in the statute, it substantially complies and is therefore valid.

federal court in Minnesota in 2015. *See EEOC v. Deluxe Financial Services, Inc.*, No. 15-cv-2646 (D. Minn. 2016). They claimed, *inter alia*, that while Austin was employed by Deluxe, she was subjected to disparate treatment, unlawful retaliation, and a hostile work environment with respect to her transition from male to female, in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act.  ECF 78-6.  Ms. Austin complained, *inter alia*, that she was not allowed "to use the pronoun of choice or restroom of choice as a transgender employee." ECF 78-7 (Pettengill Dep.) at 4, Tr. 8:21-25.

On January 5, 2016, Deluxe, the EEOC, and Austin entered into a "Consent Decree." ECF 78-6.  The Consent Decree applied to all Deluxe facilities and locations, and covered the period from January 2016 to January 2019. ECF 78-6, ¶¶ 8-9. It required Deluxe to take various remedial measures regarding harassment and discrimination based on gender identity. In particular, the Consent Decree stated that Deluxe "shall…review its existing EEO policies and practices to conform to the law and revise, if necessary," to include statements on prohibiting discrimination based, *inter alia*, on "disability (including gender dysphoria), sex-stereotyping, gender identity, and transgender status." *Id.* ¶ 25. Further, it provided that, "at a minimum," the policies "must include" a "description of the consequences, up to and including termination, that will be imposed upon violators of Defendant's anti-discrimination policies[.]" *Id.*

The Consent Decree also provided that Deluxe would "ensure that employee requests to change sex-designation or name information in Defendant's internal records, computer and communication systems are fully and promptly complied with." *Id.* ¶ 27. And, Deluxe was obligated to ensure that access for transgender employees "to restrooms commensurate with their gender identity will remain unhindered." *Id.* ¶ 28.

With respect to training, the Consent Decree stated, *id* at 14:

33. At least annually, Defendant shall provide EEO training for all its personnel.

34. Employees: Under this provision, all United States-based Deluxe employees, including employees, supervisors, managers, and Human Resources personnel, will be trained annually at a minimum in the following areas: (a) the Defendant's policy and procedures for reporting alleged discrimination; (b) understanding the kind of conduct which may constitute unlawful sex and disability discrimination, including discrimination based on sex-stereotyping, gender-identity, transgender status, and gender dysphoria; (c) the penalties of engaging in discriminatory behavior; and (d) Defendant's non-retaliation policy. All training under this Paragraph shall be at Defendant's selection and expense. This training shall be incorporated into Defendant's existing mandatory training program, which includes penalties for employees who fail to complete the training each year.

In addition, the Consent Decree provided for a compliance process by which the EEOC could petition the U.S. District Court for the District of Minnesota to "enforce the terms of" the Consent Decree. *Id.* ¶ 46. And, it stipulated that the district court would retain jurisdiction to "order appropriate relief to remedy the non-compliance, including attorneys' fees and appropriate injunctive relief." *Id.*

According to Kimberly Pettengill, Employee Relations Manager at Deluxe, "it was not optional" for Deluxe to comply with the Consent Decree. ECF 78-7 at 5, Tr. 9:1-3. Pettengill testified that paragraph 25 of the Consent Decree "required Deluxe to update all of the employee policies to make sure they included language about transgender and other sex stereotyping policies." *Id.*, Tr. 9:20-24. Further, paragraphs 33 and 34 required "mandatory training on gender discrimination of all employees," with "no exceptions." *Id.* at 7, Tr. 12:3-15. Further, she affirmed that "if Deluxe permitted employees to intentionally misuse gender pronouns of other employees" or "refused to permit a transgender employee to use a restroom of their choice," Deluxe "would violate the consent decree." *Id.* at 9, Tr. 14:1-11.

### C.  Employee Training

According to Pettengill, as a result of the Consent Decree, Deluxe modified its employee handbook and employee harassment training.  ECF 78-7 (Pettengill Dep.) at 10, Tr. 15:13-23; *id.* at 12, Tr. 17:14-17.[3]  Julie Loosbrock, then the Chief Human Resources Officer at Deluxe, states that Deluxe contracted with Corpedia Corporation to "develop the content and software for the Training, to host the Training, and to provide other services relating to it." ECF 85-9 (Loosbrock Aff.), ¶ 3. The training cost Deluxe approximately $320,000. *Id.*  The Training "was computer/web based and it included, among other things, questions about various factual situations to help demonstrate that the employee not only had been advised of Deluxe's policy, but also that he understood its requirements and how it should be applied in the workplace." *Id.* ¶ 4.

In particular, with respect to the Training, Deluxe added two new questions concerning two scenarios involving transgender employees. ECF 78-7 at 12, Tr. 17:4-11; *see* ECF 78-8 (Deluxe Training Script) at 21-22.

 One new question pertained to a scenario in which an employee who is transitioning wants to use a restroom of her choice. The scenario stated, ECF 78-8 at 21: "Frank is in the process of transitioning to a female, has legally changed his named to Francine, and has begun to dress in female attire. She has asked her boss, Sal, to change her name on the company's phone directory and other records and has requested the use of the female restroom. Even though the company has changed the phone directory, Sal has instructed her to continue to use the male restroom." The

---

[3] Defendant refers to the relevant training as "Ethics and Compliance Training." ECF 78-2 at 6. In contrast, plaintiff refers to it as a "Multiple Choice test." ECF 80 at 7. As discussed, *infra*, the training program included multiple choice questions, but it was not limited to a multiple choice test. *See* ECF 78-8. I shall refer to it as the "Training."

question asked, *id.*: "Could Sal's restricting Francine's use of the female restroom be a form of discrimination?"

The answer choices included, *id.* at 22:

1. Yes; Sal's decision was based on personal appearance

2. Maybe; it depends on how many months until Francine's transition is complete

3. Yes; laws and company policy may protect Francine while transitioning to female

4. No; as her boss Sal is able to instruct Francine on what restroom to use

5. Yes; Sal's behavior constitutes discrimination based on religion

In the "Scenario Feedback," the Training script provided, *id.*: "Laws and company policy prohibits [sic] harassment and discrimination based on gender identity, transgender status, and gender dysphoria. Our organizational policy is to permit employees to use restrooms commensurate with their gender identity."  Therefore, number three is listed as the correct answer in the script. *Id.*

The second new question referred to a scenario relating to preferred pronoun usage. The scenario provided, *id.* at 22: "Alex has recently begun her transition from male to female, coming to work in female attire and requesting that her coworkers and the company use feminine pronouns when addressing her. Some of Alex's coworkers have started treating her differently." The question asked, *id.*: "Which of Alex's coworkers' behavior would likely constitute harassment?"

The answer choices included, *id.* at 22-23:

1. Gina, her manager who refuses to allow her to use the female restrooms

2. Colin, her longtime coworker who makes jokes by continually addressing her with male pronouns

3. Maria, a coworker who complimented Alex on her new attire by saying, "I like the dress you're wearing"

4. John, a manager from another department who refers to Alex as "she" in conversation with Alex's manager

5. Terry, a coworker who asks Alex how to address her in order to ensure he doesn't make a mistake

The "Scenario Feedback" provided, *id.* at 23: "Laws and company policy protects [sic] people and prohibits harassment based on gender identity, transgender status, and gender dysphoria. Our company policy allows employees to use restrooms commensurate with their gender. In order to avoid even the semblance of harassment and discrimination, address all employees how they wish to be addressed, especially if they have changed their name." Therefore, numbers one and two were identified as the correct responses. *Id.* at 22-23.

The Training script indicates that if an employee selects the incorrect answer, then the employee is told to "TRY AGAIN" and "review the course material." ECF 78-8 at 41. The parties do not fully explain what happens to an employee if he or she continues to answer the question incorrectly.  But, defense counsel states, ECF 78-2 at 6: "The Training required employees to identify the correct answers…"; *see also* ECF 80-1, ¶¶ 5, 7; ECF 78-13 at 3.

According to both Deluxe employees and the Employee Handbook (the "Handbook"), Deluxe required all employees to complete the Training. *See* ECF 78-9 (Loosbrock Deposition) at 4, Tr. 40; ECF 78-10 (Arnston Deposition) at 3, Tr. 18 (noting that Deluxe requires all employees to do the "ethics and compliance training"). The Handbook states, ECF 78-11 at 7:

Every employee is responsible for understanding, adhering to and enforcing the Ethics and Compliance Program, and Deluxe expects 100% training compliance. Employees who do not complete the assigned training by December 31, will receive the following financial consequences:

- Annual compensation will be reduced by the equivalent of 1% of base compensation….
- Employees who are eligible for Long Term Incentive (LTI) will not receive an option grant.

In addition, Loosbrock testified that Deluxe had required its employees to complete the Training and, for the last four years, had imposed a one percent salary reduction on employees who did not complete it. ECF 78-9 (Loosbrock Dep.) at 4, Tr. 40.  Similarly, Pettengill testified that a one percent salary reduction "is standard practice for not completing the requiring training." ECF 85-5 (Pettengill Dep.) at 5, Tr. 22. According to Loosbrock, the reduction in pay would occur in "the March time frame every year for the previous year." ECF 85-6 (Loosbrock Dep.) at 7, Tr. 46. In other words, if an employee failed to complete the Training in 2017, then his or her salary would be reduced in March 2018.

Brennan states that he was required to take "Deluxe's multiple choice test on two occasions" during his employment. ECF 80-1, ¶ 5. The first instance occurred "sometime in September 2016" after Deluxe had acquired Payce. *Id.* ¶ 5. According to Brennan, the test "had similar transgender questions" which he "could not answer the way Deluxe wanted," so he was not able to complete the course. *Id.* However, he states: "[A]fter logging onto the system on a subsequent day, I noticed that the test had been automatically pushed through to a 'completed' status, without requiring me to answer such questions with the answers that were 'expected.'" *Id.*

Brennan was required to complete a second training in 2017. *Id.* ¶ 6. Although Brennan "had no objection to completing the Multiple Choice test," he claims that his "religious beliefs prevented [him] from choosing the answers which Deluxe required in order to complete the test." *Id.* ¶ 7. In particular, plaintiff avers that he had an issue with the answer choices for the question relating to preferred pronoun usage for Alex, the employee transitioning from male to female. *See*

ECF 78-8 at 22; ECF 80-3 (Screenshot of the question from the training program).[4] The answer choices in the version of the Training on Brennan's screen included, ECF 80-4 at 2:

    A.  John, a manager from another department who refers to Alex as "she" in a conversation with Alex's manager

    B.  Terry, a coworker who asks Alex how to address her in order to ensure he doesn't make a mistake.

    C.  Maria a coworker who complimented Alex on her new attire by saying "I like the Dress you're wearing."

    D.  Collin her long-time coworker who makes jokes by continually addresses [sic] her with male pronouns.

    E.  Gina, her manager, who refuses to allow her to use the female restroom.

Employees were supposed to choose answers D and E. ECF 80-1, ¶ 9. But, plaintiff states, *id.* ¶ 10: "I could not choose D or E, because in the case of D, it would be endorsing the idea that addressing Alex in a manner that is consistent with Alex's birth gender would be considered wrong by the company's policy which is contradictory to my religious belief that I should address Alex by Alex's birth gender." With respect to E, plaintiff states, *id.* ¶ 11: "[I]t would be endorsing the idea that refusing Alex access to the female restroom would be considered 'wrong' by the company's policy which is contradictory to my religious belief that only those who were actually born females should be using the female restroom."

Further, Brennan explains: "Forcing me to answer the questions the way Deluxe wanted me to would be forcing me to deny my beliefs and I could not do that." *Id.* ¶ 12.  Brennan adds that the "source of [his] religious beliefs is the Bible."  *Id.* ¶ 14.  And, he states, *id.* "[I]t is my

---

[4] The parties do not explain the difference between the answer choices in ECF 78-8 and ECF 80-4, but it appears that ECF 78-8 is a "Course Script" that is intended to be adapted by the company. Thus, for the relevant question, it appears that Deluxe used the scenario and question from the Course Script, but altered the answer choices.

sincere belief that Deluxe policy on gender identity and forcing employees to use non-birth pronouns is actually discriminatory towards religion." Plaintiff also avers that no one told him that "Deluxe had a Consent Decree which required this multiple choice test." *Id.* ¶ 15.

In May, June, and July of 2017, Brennan engaged in a series of emails with Petra Ott, Human Resources Business Partner for Deluxe, explaining his position. On May 24, 2017, Brennan stated, ECF 78-13 at 5:

> I was just in the process of taking the required '2017 Workplace Harassment: Employee Edition' and I ran into at least two questions that I find offensive and discriminatory towards my faith in God; I find it somewhat ironic that one of the protected categories mentioned is 'religion', and yet the course forces you to answer a certain way on the questions, or it will not let you continue. This is basically tantamount to brainwashing, and I don't accept that. I can provide you with further details as to why the questions and the presumed answers are offensive to me, but I am hoping that won't be necessary.

Ott replied to Brennan's email on the same day, stating that she was taking "PTO," or paid time off, the next day, but she would respond to Brennan's question when she returned to work on June 6th. *Id.* Thereafter, in an email of June 15, 2017, Ott wrote to Brennan, stating, *id*. at 4:

> Deluxe is an all-inclusive employer. While we recognize that each of our employees is unique, and that each employee may hold different views, values and opinions about the world around us, the Ethics and Compliance courses are designed to reflect our policy of inclusiveness and non-discrimination.
>
> It is important that as an employee of Deluxe you recognize that we do not expect you to change your values or beliefs but rather, as an employee, your behaviors at work are expected to uphold Deluxe's standards and values.

Brennan responded to Ott by email the next day. *Id.* at 3. He stated that the Training included a question about a transgender employee, "Alex," who is transitioning from male to female, and it asked: "'Which of Alex's coworkers' behavior would likely constitute harassment?'" *Id.* Brennan stated, *id*.: "The answers that the course sees as 'correct' are contradictory to my faith in God, and I refuse to be forced to answer a question in a way that would

make me compromise my faith in God." He also said, *id.*: "The course would not allow me to continue with what it viewed as the 'correct' answer, and so I attempted to start it over last night, and the same thing happened."

> Further, Brennan espoused his religious beliefs, stating, *id*:

> I am a born-again Christian who believes in the one and only God of the universe, the God who has revealed Himself to be God the Father, God the Son (Jesus), and the Holy Spirit. He created male and female, and although someone can cut off body parts and inject themselves with hormones, they can never become a different sex. Now as I understand it, Deluxe's policy requires employees to address a person using pronouns reflecting the sex that the person identifies him/herself with, and not necessarily the sex they were born as; For example, in the hypothetical example in the course, Alex is a man but desires to become a woman, so in that case Deluxe would expect employees to use 'her' referring to Alex, and not 'him.'

> Let me be quite clear on this. I will never be following this guideline. If God has created someone as a man, I will use the pronoun 'him' to refer to that person, or if God created someone as a woman, I will use the pronoun 'her' to refer to that person. Bruce Jenner was created a man. He can cut things off and do whatever procedure he wants, but he will never become a woman, and I will never address him as such. It is an abomination to the God that created this universe,

> Now of course, Deluxe could decide to reduce my salary if the ethics course is not completed (I believe there was something in the employee handbook about that), or Deluxe could decide to invoke a disciplinary action, or even a termination; Any such actions would be a clear case of religious discrimination, and a violation of state and federal laws. Quoting the ethics course, 'It is also unlawful to harass or discriminate against another person because of his or her religious beliefs and practices' . . . .

> In closing, Brennan said, *id.*: "I encourage Deluxe to . . . not try to force its employees to do anything that would violate their conscience . . . ."

> Thereafter, by email of July 14, 2017, Ott informed Brennan that he would not be excused from the Training requirement, *id.* at 2 (emphasis in original):

> Together with Deluxe's Employee Relations and Legal team we have carefully reviewed your response.

> Deluxe has designed the Ethics and Compliance program to establish clear expectations of employee behaviors that are not only aligned with Deluxe's shared

values but also comply with the guideline of U.S. **Equal Employment Opportunity Commission (EEOC)**.

As we have previously communicated in this email the mandatory Ethics and Compliance training for all Deluxe employees does not ask employees to change their personal values and beliefs.
The training is an acknowledgement that every employee understands Deluxe's values, Deluxe's policies and procedures and to guide employee behaviors while they are in our employ.

All employees are subject to our policy when it comes to completion of the training for each calendar year.

I trust that we have helped you to have a better understanding of the purpose and design of Deluxe Ethics and Compliance program. We now consider the matter closed.

Ott consulted with Pettengill "around June and July of 2017" regarding Brennan's emails concerning the Training. ECF 78-7 (Pettengill Dep.) at 11-15, Tr. 17:24-20:03. Pettengill testified that she understood Brennan's email as a request for an accommodation due to his religious beliefs. *Id.* at 13, Tr. 18:11-18. Further, she explained that, as an employee relations manager, she was responsible for handling requests for religious accommodations because all HR managers "were required to partner with employee relations before denying an accommodation." *Id.*, Tr. 18-19. She also worked with Deluxe's legal counsel in evaluating requests for religious accommodation. *Id.* at 14, Tr. 19:1-6.

Pettengill spoke to Mary Budge, in-house counsel for Deluxe, about Brennan's request. *Id.* at 14, Tr. 19. Pettengill testified that Deluxe ultimately decided not to grant Brennan's request "[b]ecause after reviewing his request, it was determined that it was in violation of the consent decree requirement…and it was about behaviors of the workplace, and in no way was telling him he needed to change his beliefs." *Id.* at 15, Tr. 20:4-16.

Brennan never completed the Training. Thus, on December 19, 2017, Brennan, Wendi Arnston, a human resources manager at Deluxe, and Ott spoke on the phone to discuss Brennan's

status and "to give him opportunities to ask questions." ECF 80-11 (Ott's notes from phone call). According to Ott's notes from the call, Arnston stated to Brennan that it would be the "expectation[] for him to go in and finish the course[]." *Id.* at 3. Further, Arnston told Brennan that "if he continues to refuse to do the course, that it will be considered subordination and it will have consequences of further correction action up to and including termination of employment." *Id.*

Thereafter, on January 8, 2018, Pettengill emailed Ott, Arnston, Budge, and Daishara Andreotti, Human Resources Vice President, stating, ECF 80-8 at 2: "I reviewed the situation with Julie [Loosbrock] today regarding Fred [Brennan] and the previous conversations we have had with him. After careful consideration, Julie does not support termination at this time. She feels that ultimately, we would be terming [sic] for intention rather than actual action. We will apply the 1% salary reduction (which he has said he will fight) for not completing the training and restate again that the expectation is that he will follow our policies. If his actions at any time do not align with our policies, he could be subject to further action up to and including termination."

At her deposition, Pettengill explained that she wrote this email "in response to questions regarding any action that would be taken towards Fred for not completing the required training." ECF 85-5 (Pettengill Dep.) at 5, Tr. 22:3-6. And, Deluxe ultimately reduced plaintiff's salary because "[i]t is the standard practice for not completing the required training." *Id.*, Tr. 22:9-18.

In addition, Loosbrock testified that Pettengill's email addressed the possibility of terminating Brennan for saying "he would not comply with…using a pronoun for someone in transition, and that…he was not going to follow our policies at Deluxe." ECF 85-6 (Loosbrock Dep.) at 4, Tr. 43:17-25.  But, she stated that Deluxe was not considering termination of Brennan "for not completing the training." *Id.* at 4-5, Tr. 43:14-44:6. Further, Loosbrock indicated that

Brennan "shouldn't be terminated for just what he's saying he might do in the future." *Id.* at 5, Tr. 44:12-25.

Arnston held a conference call with plaintiff and Vain on January 19, 2018. Arnston "advised [Brennan] that Deluxe decided to reduce" his salary by one percent, "based on the fact that [he] did not complete the Multiple Choice test." ECF 80-1, ¶ 18.

Thereafter, on February 5, 2018, plaintiff filed a Charge of Discrimination with the EEOC, alleging religious discrimination on account of the salary reduction. ECF 78-21. On February 28, 2018, the EEOC issued a Dismissal and Notice of Right to Sue. *Id.* at 3. A copy of the Notice of Right to Sue was also sent to Budge. *Id.* at 3; ECF 80-1, ¶ 19.

Plaintiff avers, ECF 80-1, ¶ 17: "Other than the attempts to force me to take the Multiple Choice test under penalty of a salary reduction, no one at Deluxe made any effort to work with me, or offer any suggestions, to arrive at any accommodation for my religious beliefs." Further, Brennan claims that he "would not have been opposed to a live or video presentation on Defendant's equal employment policies if Deluxe had requested it during working hours." *Id.*

### D.  Brennan's Disciplinary Record

Brennan avers that he "always received satisfactory Performance Evaluations while at Payce and Deluxe." ECF 80-1, ¶ 1. But, in 2016, prior to any issues concerning Brennan's religion or the Training, Brennan received a "Record of Disciplinary Action." ECF 78-15 ("2016 Disciplinary Action") at 2. The stated reason for the action was "Failure to perform duties as assigned – investigation of defects related to assigned tasks…." *Id.*

Shortly after Brennan received the 2016 Disciplinary Action, he emailed Kathleen Strakes, President of Payce, to "lodge a formal complaint" against Vain. ECF 78-16. He stated, *id.* at 2: "My perception (based on recent actions taken by Mr. Vain, and by actions taken since the death

of my former manager…) is that I am being harassed and singled out for termination by Mr. Vain." Plaintiff identified three specific instances in which he believed he was wrongfully accused by Vain. *Id.*

Vain cited Brennan for "unsatisfactory performance" on March 29, 2018. ECF 78-17 ("2018 Disciplinary Action"); ECF 80-6 (same). The report stated, ECF 78-17 at 1: "Over the past couple of years there have been issues with Fred's performance and his ability to perform at the expected level for his position. When Fred is given a task of higher complexity (more than just maintenance of a project) he struggles to complete the task without pulling in many of the employees and manager in the IT area to figure out the issues. At Fred's level he should not have to rely on so many others to complete his work." Further, it provided, *id.*: "In 2016 Fred was placed on a warning for similar issues. Fred has been coached and directed many times by both his manager and his peers since that initial warning. At this point we will issue a formal warning to provide more direction/supervision to reach the performance level expected."

The report also provided a list of examples of "performance issues." *Id.*  It noted, *inter alia*, that plaintiff was unable to "research, troubleshoot and investigate obstacles" he encountered, on matters "within the scope" of his duties.  In conclusion, the report warned, *id.* at 2: "Should there not be immediate and sustained improvement in your performance as outlined above, further disciplinary action up to and including employment termination will be imposed."

In his Affidavit (ECF 80-1), Brennan states, *id.* ¶ 21: "I vigorously dispute the March 29, 2018 discipline. The discipline issued to me on March 29, 2018…was not actually a performance problem, but was manufactured by Mark Vain to look like it was."  He adds that it "was just a veiled attempt to make it look like [plaintiff] was negligent in order to facilitate [his] termination." *Id.* ¶ 21(B).  Further, Brennan claims that the 2018 disciplinary action "was quite a shock" to him,

"because since August 2016 (19 months), Mark Vain had not informed [him] of any performance problems." *Id.* ¶ 21(C).

Shortly thereafter, on April 4, 2018, Brennan emailed Arnston with another complaint about Vain. ECF 78-18. In the email, Brennan stated, *id.* at 2: "My intention with this email is to demonstrate that this disciplinary action and the last one (which was issued August 26, 2016) actually have nothing to do with my performance but are motivated by a grudge that Mark is still holding for me pointing out to our former manager…that Mark was having extended personal conversations during non-break periods[.]" In addition, plaintiff said that he believed the disciplinary action constituted "retaliation for the complaint" he submitted to the EEOC for religious discrimination. *Id.* at 3.[5]

### E.  Brennan's Termination

On April 20, 2018, Deluxe terminated Brennan. ECF 78-19 ("Notice of Termination"). The Notice of Termination stated that Brennan was "involuntarily terminated" because, *id.* at 2: "Performance not meeting expectations." Vain testified that he recommended the termination at some point after he submitted the 2018 Disciplinary Action. ECF 78-20 (Vain Dep.) at 3-4, Tr. 70:20-71:14.

Arnston explained at her deposition how Deluxe reached the decision to terminate plaintiff. She recalled that when Brennan "was put on the warning," he "was clear that he had no performance concerns, that his performance was meeting expectation, and that there was nothing for him to improve on[.]" ECF 78-10 (Arnston Dep.) at 5, Tr. 55:2-8. She "shared" that information with Vain. *Id.*, Tr. 55:9.  Thereafter, Vain continued to reach out to Brennan to follow up with

---

[5] Notably, Brennan did not bring a retaliation claim in this suit. *See* ECF 1-4.

Brennan about his performance. *Id.*, Tr. 55:11-14. According to Arnston, Brennan "was taking no action to improve his performance," so "a decision was made" that if he was "not going to improve and his performance is not meeting expectations, that we would terminate his employment." *Id.*, Tr. 55:15-20. Arnston recounted: "The employment as it was was not acceptable performance, not meeting expectations." *Id.*, Tr. 55:21-56:4. According to Arnston, Vain made the final decision because it is "primarily the manager's responsibility" to decide on matters of "performance improvement." *Id.* at 6, Tr. 56:13-16.

Notably, Arnston claimed that Brennan's failure to take the ethics course was not taken into account in deciding to terminate him because it "was a separate issue." *Id.* at 8, Tr. 65:3-12. She stated: "We weren't talking about ethics compliance at the time [that they were discussing termination]. We were talking about his performance only." *Id.*, Tr. 65:14-16. And, she noted that "his ethics compliance" was "not a performance issue." *Id.*, Tr. 65:17-19.

Vain testified that he "hadn't really put any thought into" the fact that Brennan did not complete the ethics course when deciding to terminate him. ECF 78-20 (Vain Dep.) at 5, Tr. 82:20. He said, *id.*, Tr. 82:6-7: "That's an issue between the employee and HR."

Pettengill, Loosbrock, and Ott all testified that they were not involved in the decision to terminate Brennan's employment with Deluxe. ECF 78-7 (Pettengill Dep.) at 16, Tr. 25:2-21; ECF 78-9 (Loosbrock Dep.) at 6-8, Tr. 51:18-53:14; ECF 78-14 (Ott Dep.) at 3-5, Tr. 21:7-23:11.

On May 21, 2018, plaintiff filed another Charge of Discrimination with the EEOC, alleging retaliation and religious discrimination. ECF 78-22.  The EEOC issued a Dismissal and Notice of Right to Sue on December 13, 2019. *Id.* at 3.  This suit followed.

Additional facts are included, *infra*.

## II.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla

of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). That said, "a party's 'self-serving opinion

... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp*., 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact."  10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

### III.   Discussion

#### A.  Title VII Generally

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1); *see Young*

- 21 -

*v. United Parcel Service, Inc.*, 575 U.S. 206, 135 S. Ct. 1338, 1344 (2015); *Roberts v. Glenn Industrial Group, Inc.*, __ F.3d__, 2021 WL 2021812, at *3 (4th Cir. May 21, 2021); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Of relevance here, Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's religion." 42 U.S.C. § 2000e-2. "Religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id*. § 2000e(j). This definition "includes a requirement that an employer 'accommodate' an employee's religious expression." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017-18 (4th Cir. 1996); *see U.S. Equal Emp't Opportunity Comm'n v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008).

Generally, courts recognize "two theories in asserting religious discrimination claims." *Chalmers*, 101 F.3d at 1017. These are "denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.* Brennan's remaining claim falls under the failure to accommodate theory.

To state a prima facie failure-to-accommodate claim, an employee must allege that: "'(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" *U.S. Equal Emp't Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017) (quoting *Firestone*, 515 F.3d at 312) (alterations

- 22 -

in *Consol Energy*), *cert. denied*, ___ U.S. ____, 138 S. Ct. 976 (2018). The rule for "claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *U.S. Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015).

Notably, in contrast to a disparate treatment case, in "a religious accommodation case, an employee can establish a claim even though [he] cannot show that other (unprotected) employees were treated more favorably or cannot rebut an employer's legitimate, non-discriminatory reason for [his] discharge." *Chalmers*, 101 F.3d at 1018; *see Abeles v. Metro. Wash. Airports Auth.*, 676 F. App'x 170, 176 (4th Cir. 2017). To that end, "an employer must, to an extent, actively attempt to accommodate an employee's religious expression or conduct even if, absent the religious motivation, the employee's conduct would supply a legitimate ground for discharge." *Chalmers*, 101 F.3d at 1018.

"If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious needs without undue hardship." *Chalmers*, 101 F.3d at 1019; *see Firestone*, 515 F.3d at 312 (noting that in religious accommodation cases, courts employ a burden-shifting framework similar to the one articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)); *see also* 42 U.S.C. § 2000e(j). To satisfy its burden, the employer must demonstrate "'*either* (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances or (2) that such accommodation was not provided because it would have caused an undue hardship—that is, it would have 'result[ed] in "more than a de minimis cost" to the employer.'" *Firestone*, 515 F.3d at 312 (quoting *Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. 60, 67 (1986)) (internal citation omitted)) (alterations

and emphasis in *Firestone*).  Notably, "[e]ither one of these conditions is sufficient." *Reed v. Fairfax Cty., Virginia,* No. 1:18-CV-1454, 2020 WL 252992, at *5 (E.D. Va. Jan. 15, 2020).  And, "if an employer has provided a reasonable accommodation, [the court] need not examine whether alternative accommodations not offered would have resulted in undue hardship." *Firestone,* 515 F.3d at 312.

The concepts of reasonable accommodation and undue hardship are not defined by Title VII.  Therefore, "the precise reach of the employer's obligation to its employee is unclear.... and must be determined on a case-by-case basis." *Beadle v. Hillsborough Cty. Sheriff's Dep't,* 29 F.3d 589, 592 (11th Cir. 1994); *see Tabura v. Kellogg USA,* 880 F.3d 544, 558 (10th Cir. 2018) ("Whether an employer will incur an undue hardship is a fact question…that turns on 'the particular factual context of each case.'") (internal citation omitted). The Fourth Circuit has explained: "The [statute's] use of the terms 'reasonably' and 'undue hardship'…indicates that this is a field of degrees, not a matter for extremes. Both terms are 'variable ones,' dependent on the extent of the employee's religious obligations and the nature of the employer's work requirements." *Firestone,* 515 F.3d at 313 (citing *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 120 (4th Cir. 1988) (en banc) (Wilkinson, J., concurring)). In sum, the reasonable accommodation and undue hardship standards "ensure that while an employer must 'actively attempt to accommodate an employee's religious expression or conduct,'…it is not required to do so 'at all costs.'" *Firestone,* 515 F.3d at 314-15 (quoting *Chalmers,* 101 F.3d at 1018; *Philbrook,* 479 U.S. at 70)

Of relevance here, an accommodation constitutes an undue hardship if it would impose more than "a *de minimis* cost" on the employer. *Hardison,* 432 U.S. at 84. "Both economic and non-economic costs can pose an undue hardship upon employers." *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009). For instance, courts have found that non-economic costs such

as damage to employee morale, compromise of a collective bargaining agreement or seniority system, or unequal treatment of other employees, can constitute undue hardships. *See, e.g.*, *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) (citing *Webb*, 562 F.3d at 260); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) (finding that "[t]he mere possibility of an adverse impact on co-workers as a result of 'skipping over' [an employee in a scheduling system] is sufficient to constitute an undue hardship") (citation omitted); *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (noting that an undue hardship may be present "where an accommodation would impose more than a de minimis impact on coworkers, such as depriving coworkers of seniority rights or causing coworkers to shoulder the plaintiff's share of potentially hazardous work"); *accord United States v. Bd. of Educ.*, 911 F.2d 882, 887 (3d Cir. 1990) (noting that the Supreme Court has suggested that "the undue hardship test is not a difficult threshold to pass") (citing *Hardison*, 432 U.S. 63). Additionally, the Fourth Circuit has found more than a minimal burden where an employee's religious need imposes "personally and directly on fellow employees" such as by "invading their privacy and criticizing their personal lives." *Chalmers*, 101 F.3d at 1021.

## B.  Failure to Accommodate

As indicated, to succeed on a failure-to-accommodate claim, a plaintiff must establish that: "'(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" *Consol Energy, Inc.*, 860 F.3d at 141 (quoting *Firestone*, 515 F.3d at 312) (alterations in *Consol Energy*).

Plaintiff brings a failure to accommodate claim based on two disciplinary actions that he experienced: a one percent salary reduction and then termination.[6] It is undisputed that Deluxe disciplined Brennan for failing to complete the Training by reducing his salary. ECF 85 at 11 (noting that Deluxe has "never questioned the sincerity of Mr. Brennan's Christian faith and has always maintained that his salary was reduced for failing to complete the Training"). On the other hand, defendant vigorously disputes the claim that Brennan's termination from Deluxe was related to his failure to complete the Training. *See* ECF 78-2 at 18-22. I shall address each contention, in turn.

### i.

To the extent that plaintiff's failure-to-accommodate claim is based on a salary reduction, it is uncontested that plaintiff satisfies the second and third prongs of his failure-to-accommodate claim. Plaintiff clearly informed Deluxe of his religious belief in his emails to Ott. *See* ECF 78-13; *see also* ECF 78-7 (Pettengill Dep.) at 13, Tr. 18. And, as noted, Deluxe subsequently reduced plaintiff's salary by one percent, because he did not complete the Training.

However, defendant contends that plaintiff fails to satisfy the first prong of the test because there was no conflict between Brennan's religious belief and the employment requirement. ECF 85 at 11-13. According to Deluxe, in requiring Brennan to complete the multiple choice questions for the Training, he was only being asked to "acknowledge his understanding of *someone else's*

---

[6] In reply, plaintiff invokes the Freedom Restoration Act of 1993 ("RFRA"), arguing that the Consent Decree unfairly burdens plaintiff's religious liberty. ECF 88 at 6-7. However, because plaintiff mentions the RFRA for the first time in reply, I decline to consider this contention. *See United States v. Al–Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (declining to consider argument first raised in reply brief and noting that it "is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned"); *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

*opinion*," not change his own opinions on transgender individuals. *Id.* at 13 (emphasis in original). Thus, Deluxe argues, the "employment requirement simply did not implicate Mr. Brennan's religious beliefs." *Id.* at 14.

Defendant's perspective on what constitutes a conflict is too narrow. As Brennan recounts, certain answers were required in order to complete the Training. Because plaintiff would not agree to choose the answers sought by Deluxe, he could not complete the employment requirement. In his Affidavit, plaintiff avers: "Forcing me to answer the questions the way Deluxe wanted me to would be forcing me to deny my beliefs and I could not do that." ECF 80-1, ¶ 12. Moreover, plaintiff communicated this conflict to Deluxe in his email to Ott when he stated, ECF 78-13: "The answers that the course sees as 'correct' are contradictory to my faith in God, and I refuse to be forced to answer a question in a way that would make me compromise my faith in God."

Whether Deluxe was asking plaintiff to change his personal opinions is irrelevant. Brennan was sanctioned because he was unwilling to provide the answers sought by Deluxe. In turn, that meant he could not complete the Training. Because Brennan failed to complete the Training, his salary was reduced. *See Buonanno v. AT&T Broadband, LLC*, 313 F. Supp. 2d 1069, 1081 (D. Colo. 2004) (finding that plaintiff met the first element of his prima facie failure to accommodate claim because plaintiff was concerned that his beliefs conflicted with language in the employee handbook).

Plaintiff's belief is clearly more than a "mere preference," and neither side contends otherwise. And, the cases on which defendant relies are inapposite. *See Dachman v. Shalala*, 9 Fed. App'x 186, 192 (4th Cir. 2001) (noting that plaintiff's desire to pick up bread for a religious service on a particular day was a preference, even though it was being done in the religious context); *Daniel v. Kroger Limited P'ship I*, No. 3:11-cv-245, 2011 WL 5119372, at *8 (E.D. Va.

Oct. 27, 2011) (noting that plaintiff must "establish that there was a conflict between that belief and his employment" and that "Title VII affords no protection for mere preferences").

I am satisfied that plaintiff has established that he had a bona fide religious belief that conflicted with an employment requirement.

### ii.    Undue Hardship Defense

Because plaintiff has established a prima facie case as to the claim based on the salary reduction, the burden shifts to defendant to show either that a reasonable accommodation was provided to plaintiff or that a reasonable accommodation was not possible without causing undue hardship to its business. *Firestone*, 515 F.3d at 315; *Chalmers*, 101 F.3d at 1019.  Defendant does not contend that it offered plaintiff any sort of accommodation. Thus, the question is whether Deluxe has demonstrated that it could not accommodate Brennan's religious belief without undue hardship.

In its Motion, Deluxe argues that accommodating Brennan's religious views by excusing him from fulfilling the Training would have caused undue hardship because of Deluxe's legal obligations under the Consent Decree and the "protections afforded to employees based upon gender identity under Maryland law." ECF 78-2 at 15-18.

In response, plaintiff posits that defendant's undue hardship defense fails for two reasons. First, he urges the Court not to consider Deluxe's defense based on the Consent Decree because Deluxe "failed to raise this defense in its answers to Plaintiff's interrogatories." ECF 80 at 11-13. Second, he argues that the Consent Decree did not mandate use of a format for training that obligated an employee to answer questions in a certain way.  Plaintiff avers that Deluxe could have accommodated plaintiff's religious conflict "by offering a live or video presentation" of Deluxe's

workplace policies, without violating its requirements under the Consent Decree or anti-discrimination laws. *Id.* at 19.

Plaintiff does not cite any rule or case law in support of his contention that the Court should strike defendant's undue hardship defense based on the Consent Decree, for failure to disclose it during discovery. *See* ECF 80 at 11-13.  In any event, the argument lacks merit.  In its interrogatory responses, Deluxe indicated that it considered its "legal obligations" in deciding to refuse to accommodate Brennan's request. *See* ECF 85-3 at 14. Moreover, the materials that were exchanged during discovery reveal that plaintiff was on notice that Deluxe believed it was acting pursuant to its legal obligations under the Consent Decree. Deluxe produced the Consent Decree to plaintiff's counsel on October 16, 2019. *See* ECF 85-4 (10/16/2019 email to Stolarz with production of Consent Decree). And, several Deluxe employees testified about the significance of the Consent Decree in the decision to enforce the company's training requirement and to deny Brennan's request. *See, e.g.,* ECF 85-5 (Pettengill Dep.) at 3, Tr. 20; ECF 85-6 (Loosbrock Dep.) at 10, Tr. 62.

Brennan also contends that Deluxe's undue hardship defense fails because Deluxe could have fulfilled its obligations under the Consent Decree "in a less heavy handed manner." ECF 80 at 13. According to plaintiff, the Consent Decree "merely required that it provide training to its employees on transgender issues," but Deluxe had discretion to develop the training program. ECF 88 at 2. In particular, Brennan argues that instead of imposing the multiple choice questions on him, Deluxe "could have accommodated" plaintiff by requiring him "to attend a live presentation, or a video presentation." ECF 80 at 14; *see* ECF 80-1, ¶ 17 ("I would not have been opposed to a live or video presentation on Defendant's equal employment policies if Deluxe had requested it

during working hours."). Or, plaintiff posits, Deluxe "could have fulfilled its obligations" in "many other ways" to "avoid the expenditure of large sums for a custom video." ECF 88 at 3.

In response, Deluxe asserts that Brennan's suggested accommodation would have constituted an undue hardship because it would have required Deluxe to incur a $32,000 cost to create "an additional custom training" for Brennan. ECF 85 at 10; *see* ECF 85-9 (Loosbrock Aff.), ¶ 3. Further, Deluxe avers that it "would have required Deluxe to deviate from a uniformly applied and important employee [training] requirement…and…would have impaired Deluxe's ability to demonstrate (which the Consent Decree required) that Mr. Brennan actually understood the requirements and application of Deluxe's policies concerning equality in the workplace." ECF 85 at 3.

According to Deluxe, EEOC guidance, as set out in Section 12 of the EEOC Compliance Manual (the "Manual"), supports its decision to deny Brennan's request for accommodation. ECF 78-2 at 16; ECF 85 at 10; *see EEOC Compliance Manual*, *The U.S. Equal Employment Opportunity Commission*, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_Toc203359519 (last accessed May 4, 2021).[7]

In a subsection titled "Employer-Sponsored Programs," the Manual sets forth when an employer may be required to excuse an employee from training due to the employee's religious beliefs. The Manual states, in relevant part, § 12-IV(C)(7):

> [A]n employer is required, absent undue hardship to excuse an employee from compulsory personal or professional development training where it conflicts with the employee's sincerely held religious beliefs or practices. There may be cases, however, where an employer can show that it would pose an undue hardship to provide an alternative training or to excuse an employee from any part of a particular training, even if the employee asserts it is contrary to his religious beliefs to attend (e.g., where the training provides information on how to perform the job,

---

[7] The Court has not been provided with a full copy of the Manual.

on how to comply with equal employment opportunity obligations, or on other workplace policies, procedures, or applicable legal requirements).

Further, the Manual explains that an "employer may accommodate the employee's religious belief by substituting an alternative technique or method that does not conflict with the employee's religious belief or by excusing the employee from that part of the training program that poses a conflict, if doing so would not pose an undue hardship." *Id.* § 12-IV(C)(7) n.314.

Of relevance here, the Manual includes an example where an employee need not be excused from a training program, *id.* § 12-IV(C)(7):

> Employer XYZ holds an annual training for employees on a variety of personnel matters, including compliance with EEO laws and also XYZ's own internal anti-discrimination policy, which includes a prohibition on sexual orientation discrimination. Lucille asks to be excused from the portion of the training on sexual orientation discrimination because she believes that it "promotes the acceptance of homosexuality," which she sincerely believes is immoral and sinful based on her religion. The training does not tell employees to value different sexual orientations but simply discusses and reinforces laws and conduct rules requiring employees not to discriminate against or harass other employees based on sexual orientation and to treat one another professionally. Because an employer needs to make sure that its employees know about and comply with such laws and workplace rules, it would be an undue hardship for XYZ to excuse Lucille from the training.

Deluxe contends that the facts in this example are "strikingly similar to the facts of this case." ECF 78-2 at 16. Indeed, Deluxe, like Employer XYZ, created training on a variety of matters, such as compliance with EEO laws and its own anti-discrimination policies, including a prohibition on discrimination based on sexual orientation and gender identity. And, the Training is required because Deluxe needs to "make sure that its employees know about and comply with such laws and workplace rules." Manual § 12-IV(C)(7).

However, Deluxe ignores the context-dependent, fact-intensive nature of the undue hardship analysis. *See, e.g., Tabura*, 880 F.3d at 558. The example from the Manual does not include any details about the type of training that was required of the employees at XYZ or whether

the employees had to answer multiple choice questions in a certain way, as part of their training. In this case, as noted, Brennan states that he found the Training problematic because he was required to answer the multiple choice question in a way that conflicted with his religious belief. ECF 80-1, ¶¶ 7-11, 17. Thus, without more detail about the specific requirements of the XYZ training, the example is of limited value.

Also of relevance, in a footnote to the example involving Lucille and Employer XYZ, the Manual explains, *id.* § 12-IV(C)(7) (citing *Buonanno*, 313 F. Supp. 2d at 1081-83):

> If training conflicts with an employee's religious beliefs, the content of the training materials may be determinative in deciding whether it would pose an undue hardship to accommodate an employee by excusing him or her from the training or a portion thereof.  If the training required or encouraged employees to affirmatively support or agree with conduct that conflicts with the employee's religious beliefs, or signal their support of certain values that conflict with the employee's religious beliefs, it would be more difficult for an employer to establish that it would pose an undue hardship to accommodate an employee who objects to participating on religious grounds.

As indicated, Brennan maintains that answering the multiple choice questions the way Deluxe wanted would have required him to "endors[e]" ideas or conduct that are "contradictory to [his] religious belief." ECF 80-1, ¶¶ 10, 11. Therefore, according to the Manual, "it would be more difficult for [Deluxe] to establish that it would pose an undue hardship to accommodate" Brennan. Manual § 12-IV(C)(7); *see Buonanno*, 313 F. Supp. 2d at 1081-83 (concluding that employer violated Title VII when it did not accommodate employee's refusal on religious grounds to sign diversity policy asking him to "value the differences among all of us," which he believed required him to ascribe worth to a certain behaviors that he believed were at odds with his religious beliefs).

To be sure, Deluxe also had a duty to fulfill its obligations under the Consent Decree and to all other Deluxe employees. Thus, Deluxe was not required to accommodate Brennan's religious views at the expense of its statutory or legal obligations; if doing so would have an adverse impact

on Brennan's coworkers; or if doing so would have resulted in significant financial costs. *See Chalmers*, 101 F.3d at 1021 (finding that company did not need to grant accommodation when doing so would "subject itself to possible suits" from other employees); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) ("[A]n employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his coworkers or deprive them of contractual or other statutory rights.").

Notably, there are no allegations in this case that Brennan acted in an inappropriate way towards other employees based on sexual orientation, or that excusing Brennan from the training would have had a negative impact on Deluxe's employees. *See* ECF 85-6 (Loosbrock Dep.) at 4-5, Tr. 43-44 (noting that Brennan had not exhibited any harassing or discriminatory behavior). And, "[a]n analysis of undue hardship may not be based on mere speculation or conjecture." *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d 762, 789 (D.N.J. 2018); *see Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (undue hardship requires "proof of actual imposition on coworkers or disruption of the work routine" rather than "conceivable or hypothetical hardships" (internal quotation marks and citation omitted)).

Further, although defendant contends that it would have cost $32,000 to create a custom training program for Brennan, it does not otherwise cite to any evidence to establish that the $32,000 custom training is the only way it could have satisfied its legal obligations. With respect to training, the Consent Decree stated that Deluxe should provide "EEO training for all its personnel" on an annual basis. ECF 78-6, ¶ 33. And, it stated that the Deluxe employees should be trained in a number of areas. *Id.* ¶ 34. But, it also provided, *id.*: "All training under this Paragraph shall be at Defendant's selection and expense." Thus, defendant had discretion to choose its training program. And, it is far from clear that a $32,000 custom training for Brennan was

Deluxe's only option to accommodate Brennan while also complying with its legal obligation. *Cf. Kroger*, 2011 WL 5119372, at *9 (noting that summary judgment would not be proper on the basis of undue hardship where the employer "does not establish the extent of the burden imposed in a quantifiable manner").

Moreover, the cases on which defendant relies are readily distinguishable and not dispositive. *See, e.g., U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002); *Hardison*, 432 U.S. 63; *Baltgavis v. Newport News Shipbuilding Inc.*, 132 F. Supp. 2d 414 (E.D. Va. 2001). In *Barnett* and *Hardison*, for instance, the Supreme Court ruled in favor of the employers because, in both cases, the employees' accommodation requests would have impacted other employees' rights under the employers' seniority rules. *See Barnett*, 535 U.S. at 403-4 (reasoning that an employer's showing that a requested accommodation conflicts with seniority rules is sufficient to show that an accommodation is not reasonable); *Hardison*, 432 U.S. at 80-81 (finding that an accommodation would not be reasonable if it would result in unequal treatment for other employees under collectively bargained seniority system). In contrast, defendant has not demonstrated that accommodating plaintiff's request would have had any impact on its other employees.

Additionally, in *Baltgavis*, 132 F. Supp. 2d 414, the court considered whether it poses an undue hardship for an employer to accommodate an employee's asserted religious belief against providing his social security number for identification. The court concluded that the accommodation request constituted an undue hardship because "the burden of applying for a waiver of the…statutory penalty provision [for failure to include a social security number] is also more than de minimis and therefore, constitutes an undue hardship for [the employer] as a matter of law." *Id.* at 418-19.

Like the employer in *Baltgavis*, Deluxe had a legal obligation under the Consent Decree, "which it could not ignore." ECF 78-2 at 15. But, unlike the employer in *Baltgavis*, Deluxe had some flexibility in determining how it could abide by its legal obligations. *See* ECF 78-6, ¶ 34. And, it is not clear that accommodating plaintiff's religious belief in this case would have required Deluxe to violate the law or apply for a costly waiver. *Cf. Sutton v. Providence St. Joseph Medical Center*, 193 F.3d 826, 830 (9th Cir. 1999) (noting that "employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law").

On the other hand, based on the record before me, I also cannot conclude that Deluxe could have accommodated Brennan and satisfied its obligations under the Consent Decree without undue hardship. For instance, the Consent Decree requires Deluxe to train its employees to "understand[] the kind of conduct which may constitute unlawful sex and disability discrimination, including discrimination based on sex-stereotyping, gender-identity, transgender status, and gender dysphoria…" ECF 78-6, ¶ 34. Brennan claims that "there are many other ways" that Deluxe could have fulfilled this obligation. ECF 88 at 3. But, the fact that Deluxe is a "large corporation," with a "large Human Resources ('HR') Department," *id.*, does not necessarily indicate that it could have ensured Brennan's "understanding" without more than de minimis costs. *See Firestone*, 515 F.3d at 312.

In sum, given Deluxe's competing obligations, whether it acted in a reasonable manner in the instant case is a matter upon which reasonable minds might conceivably differ. This is a question for the factfinder, not the court.  It is for the jury to determine whether accommodating Brennan would have constituted an undue hardship for Deluxe.

**iii.**

As noted, plaintiff also alleges that he was terminated for failure to complete the Training. In particular, plaintiff posits that Deluxe decided to terminate him when he continued to refuse to complete the Training, even after Deluxe reduced his salary. ECF 88 at 10-13. Plaintiff further argues that "Defendant's termination on account of performance was a sham." *Id.*

Defendant vigorously disputes this claim. It contends that Brennan has not demonstrated a factual or temporal nexus between his refusal to complete the Training and his termination. ECF 85 at 14. Rather, according to Deluxe, the record demonstrates that Vain "decided to terminate Mr. Brennan's employment for a legitimate, non-discriminatory reason, namely poor performance." ECF 78-2 at 20. Moreover, Deluxe asserts that Brennan "is impermissibly attempting to bootstrap a claim of discrimination or retaliation into this case." *Id.* at 19.

The crux of the failure-to-accommodate theory is that employers cannot make a "religious practice, confirmed or otherwise, a factor in employment decisions." *Abercrombie*, 575 U.S. at 780. And, as noted, "[u]nlike disparate treatment, under a failure-to-accommodate theory[,] 'an employee can establish a claim even though [he]…cannot rebut an employer's legitimate, non-discriminatory reason for her discharge.'" *Abeles*, 676 F. App'x at 176 (quoting *Chalmers*, 101 F.3d at 1018). For example, as the Fourth Circuit explained, "an employee who is terminated for refusing to work on Sundays can maintain an accommodation claim even if other nonreligious employees were also fired for refusing Sunday work, and even though the employer's proffered reason for the discharge—the refusal to perform required Sunday work—is legitimate and nondiscriminatory (because the Sunday work rule applies to all employees, regardless of religion)." *Chalmers*, 101 F.3d at 1018. Therefore, if Deluxe terminated Brennan on account of his refusal to complete the Training, even if it is a "legitimate and nondiscriminatory" reason for discharge, then Brennan would have a claim based on his termination.

However, "to satisfy the third element of a *prima facie* case, a plaintiff must show that he was disciplined in some way connected to his religious belief." *Akwei v. Burwell*, DKC-15-1095, 2016 WL 3440125, at *10 (D. Md. June 23, 2016). And, courts are not required to overlook other legitimate reasons for disciplinary actions simply because the employee has made a request for a religious accommodation. *See Roman v. Sam's Club/Walmart*, 7:10-cv-524, 2013 WL 142986, at *6-7 (W.D.Va. Jan. 7, 2013) ("A close reading of [*Chalmers*] makes clear that courts are not prohibited from considering legitimate, non-discriminatory reasons *in toto* in a failure to accommodate claim, but are barred from considering those reasons as they relate to the requested accommodation.").

Accordingly, the question is whether a reasonable trier of fact could conclude that Brennan was terminated for failure to complete the Training, or, on the other hand, whether Deluxe terminated Brennan for his poor performance, as alleged.

Plaintiff argues that evidence from the record indicates that his termination was directly related to his failure to complete the Training. For instance, in December 2017, Arnston told Brennan that "if he continues to refuse to do the course, that it will be considered subordination and it will have consequences of further correction action up to and including termination of employment." ECF 80-11 at 3. Thereafter, in an email on January 8, 2018, Pettengill stated, in relevant part, ECF 80-8 at 2: "We will apply the 1% salary reduction (which he has said he will fight) for not completing the training and restate again that the expectation is that he will follow our policies. If his actions at any time do not align with our policies, he could be subject to further action up to and including termination." According to Brennan, this "clearly suggests…that if the Plaintiff 'did not align with [Deluxe] policies,' *i.e.*, complete the Multiple Choice test, he would be terminated." ECF 80 at 17; *see* ECF 88 at 10.

In addition, Brennan states that he had a "history of 'Successful' Performance Evaluations," dating back to 2012, so his termination "is clearly" because of his "failure to obey Defendant and complete the Multiple Choice test," rather than his allegedly poor performance. ECF 80 at 17; *see* ECF 80-2 (Performance Evaluations from July 2013 to August 10, 2017). For instance, Brennan's performance evaluation from August 10, 2017, states: "Fred has been effective overall in his past year at Payce. Over the coming year I would like Fred to take on assignments of increased scope." ECF 88-1 at 2. Because of these positive performance reviews, plaintiff avers that the alleged performance issues cited in the 2018 Disciplinary Action "were not performance related but manufactured by Mark Vain to appear so." ECF 88 at 11.

Further, Brennan argues that even if the performance issues in the 2018 Disciplinary Action were valid, Deluxe terminated him only 22 days after issuing the review. Thus, according to Brennan, Deluxe did not give him an opportunity to improve "his alleged lack of performance" before terminating him. *Id.* at 12.

Viewing this evidence in the light most favorable to plaintiff, a trier of fact could reasonably infer that Brennan's termination was "in some way connected" to his failure to complete the Training. *Akwei*, 2016 WL 3440125, at *10. The Deluxe employees apparently considered the possibility of terminating Brennan as a result of his failure to complete the Training, but instead decided to impose a salary reduction. However, they did not foreclose the possibility of terminating him later if he continued to refuse to complete the Training. Further, while Brennan may have had some performance issues, it is not obvious that his performance was so poor that it was deserving of termination only 22 days after his negative review.

Moreover, the temporal proximity between Brennan's request for a religious accommodation and his termination is not as attenuated as defendant claims. While Brennan's

initial refusal to complete the Training occurred approximately ten months prior to his termination, Deluxe was still discussing the consequences for plaintiff's failure to complete the Training at the end of 2017 and the start of 2018. And, Deluxe ultimately informed Brennan that his salary would be reduced in January 2018—only three months prior to Brennan's termination.

Deluxe, on the other hand, points to evidence from the record that indicates that Brennan's termination was completely unrelated to the Training. For instance, both Arnston and Vain stated that Brennan's failure to complete the Training was not taken into account in deciding to terminate him. *See* ECF 78-10 (Arnston Dep.) at 8, Tr. 65. ECF 78-20 (Vain Dep.) at 5, Tr. 82. Rather, according to both of them, Brennan was terminated because his work performance was not improving. *See Roman*, 2013 WL 142986, at *7 (noting that "an employer could properly discharge an employee with a pending religious accommodation request for absenteeism, poor work quality, or threatening another employee, but not because the employee refused to perform the action that was the basis of the accommodation request").

Additionally, Pettengill, Loosbrock, and Ott, who had been involved in deciding whether to accommodate Brennan's religious request, all testified that they were not involved in the decision to terminate Brennan's employment with Deluxe. ECF 78-7 (Pettengill Dep.) at 16, Tr. 25:2-21; ECF 78-9 (Loosbrock Dep.) at 6-8, Tr. 51:18-53:14; ECF 78-14 (Ott Dep.) at 3-5, Tr. 21:7-23:11. Therefore, a reasonable trier of fact could conclude that Brennan's termination was the result of his poor performance, and not, in fact, connected to his failure to complete the Training.

In sum, given the evidence presented by both sides, I cannot conclude that a reasonable jury would have to agree with one or the other. Therefore, I must deny summary judgment as to the termination claim.

**IV.    Conclusion**

For the reasons stated above, I shall deny both motions (ECF 78; ECF 80).

An Order follows, consistent with this Memorandum Opinion.


Date:  May 26, 2021                          _____/s/_____

Ellen L. Hollander
United States District Judge